1090

INTERNATIONAL EDUCATIONAL PUBLISHING COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46778.   Promulgated June 29, 1934.

*Frederick L. Pearce, Esq.*, and *J.F.W. Heinbokel, C.P.A.*, for the petitioner.

*James L. Polk, Esq.*, and *Harold F. Noneman, Esq.*, for the respondent.

## OPINION.

McMAHON: This proceeding involves the redetermination of a deficiency in income tax for the calendar year 1927 in the amount of $5,978.02. The issue presented is whether petitioner sustained a deductible loss in 1927.

The petitioner is a corporation, with its principal office in Scranton, Pennsylvania. Its business is the sale by mail of technical and commercial courses of study, commonly known as the International Correspondence School courses.

The International Correspondence Schools originated in 1890 or 1891, growing out of a need for educating the anthracite coal miners in Pennsylvania. The success of the initial course, that for mine foremen, so encouraged the founder of the school, T. J. Foster, that additional courses were added from time to time until the school was teaching several hundred courses, the total cost of development thereof being approximately $4,500,000. The courses proved to be very popular, about 1,000 students being enrolled by the end of the first year, and this enrollment was doubled during the second year, with continually increasing enrollments thereafter. In 1897 Foster discontinued the mail order plan of selling the correspondence school courses and employed salesmen on a commission basis. During 1898 and 1899 there was a considerable increase in enrollments and by 1900 the average yearly enrollments had grown to approximately 100,000 scholarships a year. Early in its existence the International Correspondence Schools began enrolling students in the other English-speaking countries and it had representatives throughout Canada, New Zealand, and Australia. Immediately after the war between Spain and the United States, schools were established in the Philippines, and later, owing to the amount of business in Spanish-

speaking countries, the correspondence school textbooks were translated into Spanish.

By 1903 the business of the International Textbook Co. had become so large, the enrollment for that year being approximately 132,000 students, that Foster decided that some organization would have to be created to attend to the foreign business of the International Correspondence School.

The International Educational Publishing Co., the petitioner herein, was created in or about 1908 for the purpose of developing the foreign business of the International Textbook Co., the company that was sponsoring the correspondence school courses. (The precise business relationship between the International Textbook Co. and others, besides petitioner, interested in International courses is not shown by the record.) The petitioner obtained concessions from the Textbook Co. for privileges to use their textbooks and materials in virtually all parts of the world except the United States and Canada. It first acquired the territorial rights to Great Britain and her colonies in 1908 or 1909; next, territorial rights to the Spanish-speaking countries in 1909; and in 1910 it acquired territorial rights to other European countries, to Africa, and to Russia.

Petitioner's foreign activities were handled largely from its London offices, which covered the British Empire, including Great Britain, Ireland, the British Commonwealths and Dominions, Egypt, Malay, India, Ceylon, South Africa, Australia, Siam, and New Zealand. The London office gave particular attention to the hiring and training of representatives and salesmen for selling the courses. In addition the office staff was constantly endeavoring to increase the work of the schools and the registration of new students, and to promote generally the correspondence school courses throughout the Empire. At one time the petitioner had over 100 branch offices in Great Britain, Ireland, Scotland, and Wales. It had offices in India, Singapore, Egypt, and South Africa, and many offices in Australia, New Zealand, and other parts of the British commonwealth and dominion. Petitioner's enrollment in Great Britain alone has amounted to over 200,000 students in one year. The experience of the petitioner in the Far East, particularly in India and Singapore, encouraged the London office to suggest to the home office at Scranton, Pennsylvania, prior to 1911, that it would welcome the addition of the Chinese and Japanese territories.

On or about March 14, 1911, the petitioner acquired the territorial rights to China and Japan in exchange for 20,000 shares of its preferred stock and 50,000 shares of its common stock, the par value of each class of stock being $50 per share. At the time petitioner was negotiating for the acquisition of these rights it had the option of

purchasing the rights to either country separately for 10,000 shares of preferred and 25,000 shares of common, but after considering their success in selling the correspondence courses elsewhere, it determined to and did acquire the rights to both countries. The instrument evidencing the agreement between the petitioner and the International Textbook Co., which sets forth the terms and conditions under which petitioner was to exploit its territorial rights in these countries, was received in evidence and is incorporated herein by reference (Exhibit 2).

The International Textbook Co. was a stockholder of the petitioner prior to and at the time the aforementioned transaction respecting the Chinese and Japanese territorial rights occurred. Its stockholdings of the petitioner at December 31, 1910, consisted of 31,614 shares of petitioner's preferred stock and 56,307 shares of common. Each class of petitioner's capital stock had equal voting rights and on December 31, 1910, the Textbook Co. held a total of 87,921 shares of the petitioner's total outstanding stock, which consisted of 120,000 shares of preferred and 100,500 shares of common.

On February 27, 1911, the petitioner sold 30,000 shares of its preferred stock to the Textbook Co. for cash at $50 per share, less a 15 percent selling commission. During the calendar year 1911 the Textbook Co., by means of its own sales' organization, sold stock of the petitioner throughout the country. Units of one share of preferred stock and one half a share of common stock were sold at $50 per unit, but no preferred stock was sold separately during 1911 by the Textbook Co. for less than $50 per share, and no common stock was sold separately for less than $20 per share. However, preferred and common stocks were sold separately through stock exchange brokers at prices ranging from $37 to $50 per share for preferred, and $15 to $23 per share for common. During 1911 the Textbook Co. sold 46,614 shares of petitioner's preferred stock and 17,625 shares of its common stock. The selling cost approximated 13½ or 14 percent, so that the Textbook Co. realized a profit on the resale of the 30,000 shares of preferred stock which it purchased on February 27, 1911.

On December 31, 1911, the Textbook Co. owned 35,000 shares of petitioner's preferred stock and 88,682 shares of its common stock out of petitioner's total outstanding issue of 170,000 shares of preferred and 150,500 shares of common.

The Japanese and Chinese territorial rights were entered upon petitioner's books by a journal entry dated March 14, 1911, in the amount of the par values of the preferred and common stocks, that is, $1,000,000 for preferred and $2,500,000 for common, less an item of $30,595.42 representing miscellaneous accounts of the Textbook

Co. which were transferred to the petitioner by the agreement of March 14, 1911.

Practically no attention was paid to China and Japan by the petitioner during the period 1911 to 1923, because its principal activities were devoted to the English and Spanish-speaking countries, and because the World War disrupted its foreign business. During this interval, petitioner's representative in these two countries was an agent at Shanghai, China, who enrolled new students on a commission basis.

Beginning in 1923 more attention was given to Japan and China, partly, no doubt, because of a verbal offer made in April 1923 by a group of men who proposed to organize a Japanese corporation with capital of 1,000,000 yen. These men proposed to issue 40 percent of the Japanese corporation's capital stock to the petitioner in exchange for the right to use its texts and courses in Japan, to issue 40 percent of the capital stock in Japan for cash, and to give the remaining 20 percent of the capital stock to the promoters in payment for their services.

The petitioner's general sales manager, C. J. Sabiston, who later became its president, made a trip to Japan in September 1923 to investigate the above offer, but due to the Japanese earthquake, which had just occurred, he found it impossible to reach Tokyo. Continuing to Shanghai, he reorganized the office of the petitioner in that city, replacing the commission agent with a salaried manager who took over the Shanghai office on or about May 1, 1924. In June 1924 Sabiston returned to Japan to further investigate the aforesaid proposal, and as a result of his investigations he recommended to petitioner's board of directors that the offer be declined, and that petitioner itself proceed with the development of the Japanese territory. Accordingly, petitioner rejected the offer, and in 1925 Sabiston made a third trip to Japan in connection with the development of petitioner's business in that territory. At that time he gave instructions to petitioner's local manager that a comprehensive survey of Japan should be made at the earliest opportunity for the purpose of determining whether petitioner should invest additional capital in the development of the territory.

This survey was made in 1927, and as a result thereof petitioner's Japanese manager recommended that petitioner invest additional capital in Japan, that it engage in an advertising campaign, that it appoint representatives in various parts of the country, and that it intensify its activities to secure additional students. At the time these recommendations were made, petitioner was securing only one or two enrollments per month from Japan, and petitioner's officers believed that the adoption of its manager's recommenda-

tions would result in additional monthly enrollments of 70 to 90 new students. Accordingly, Sabiston instructed the manager to advertise in the various English-speaking newspapers, inviting applicants of English-speaking Japanese to represent the petitioner in Japan, and late in 1927 he made his fourth trip to Japan for the purpose of interviewing applicants. These interviews were held in Tokyo and Kobe, but the applicants proved to be unsatisfactory, or were not interested when informed of what the petitioner would expect from them.

In April 1927 Seiti Hirota, a director and professor in the Kobe Technical College, visited various educational institutions in the United States and, among others, visited petitioner's home offices in Scranton. In the course of his visit he confessed to Sabiston that he had been a student of the International Correspondence School and at the same time admitted that he had enrolled under an assumed name. Upon checking the records Sabiston found that such a student had actually been enrolled from Tokyo, Japan.

While in Kobe interviewing the various applicants, Sabiston accepted Hirota's invitation to visit the Kobe Technical College and discovered that that college was using the International Correspondence School's textbooks in teaching its class on electrical engineering. Sabiston's objections that such use was unauthorized and in direct violation of Hirota's contract, which might result in legal action being taken against him, were met by Hirota's good natured reply " go ahead and take it."

Sabiston immediately consulted an American Lawyer in Kobe, who informed him that, while petitioner might seek a remedy in court, he advised against a lawsuit seeking protection under its students' contracts. Returning to Shanghai, Sabiston consulted petitioner's counsel in that city, who was also the United States Commissioner in China. The Commissioner was one of the leading attorneys in Shanghai and had been in the Orient for many years. He investigated the Japanese law for Sabiston and advised him to the same effect as had the attorney in Kobe. Upon receipt of this information, Sabiston who had been authorized by petitioner's board of directors to take whatever steps necessary in developing the Japanese territory, determined that no further efforts would be made to extend petitioner's business in Japan. He announced his decision to counsel in Shanghai, instructed the local manager to make no efforts whatever to do any more business in Japan, and wrote the comptroller of the company in Scranton advising him what action he had taken and instructing him to write off of petitioner's books the cost of the Japanese rights. This letter was mailed late in November or early in December 1927, but it is not

shown when the comptroller received the letter. Sabiston had full authority from the directors of the petitioner before leaving on this trip to investigate and decide in respect to the extension of the work in Japan, or to decide whether to abandon the territory.

Pursuant to Sabiston's instructions the petitioner charged off one half of the total cost of the Japanese and Chinese rights, amounting to $1,750,000, by a journal entry dated December 31, 1927.

Petitioner had been securing enrollments from Japan regularly but after the Japanese earthquake, and particularly after the resentment caused in Japan by the Exclusion Act of July 1924, the number of enrollments dropped considerably.

David J. Gray, comptroller and vice president of the petitioner, made a search for any records which the petitioner might have from which a segregation could be made of the number of the students enrolled in Japan and China. However, he found none, since all the students were carried under the one heading " Chinese Agency." He did find one statement, which was for the fiscal year ended April 30, 1919, which showed that 27 new enrollments were made in Japan in that year.

On its income tax return for 1927 the petitioner claimed a deduction of $805,000, representing an alleged loss sustained by the abandonment of its Japanese territorial rights. The respondent refused to allow any part of the alleged loss, upon the theory that "the operations in Japan had always shown a loss and from this it would appear that Japanese rights had no value at any time. It has not been shown wherein conditions changed in 1927 which made the rights worthless in that year, neither has an equitable basis for the allocation of the cost of the Japanese rights been presented."

Petitioner has arrived at the loss sustained as a result of its alleged abandonment of the Japanese territorial rights by assuming that one half of the stock issued for the Japanese and Chinese rights was allocable to the rights to Japan, and that the fair market value of such stock was $380,000 for preferred, at $38 per share, and $437,500 for common, at $17.50 per share. From the sum thereof, $817,500, petitioner deducted one half of the accounts receivable, inventories, and miscellaneous items, amounting to $15,297.71 (one half of $30,595.42), thereby arriving at the sum of $802,202.29 which it contends is the cost of the Japanese territorial rights on March 14, 1911, and the amount of the loss sustained in 1927.

The loss in question is grounded on the provisions of section 234 (a) (4) of the Revenue Act of 1926, which reads as follows:

SEC. 234. (a) In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*     \*     \*     \*     \*     \*     \*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise *. * *. The basis for determining the amount of the deduction for losses sustained shall be the same as is provided in section 204 for determining the gain or loss from the sale or other disposition of property.

Section 204 (b) provides:

The basis for determining the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be (A) the cost of such property * * * or (B) the fair market value of such property as of March 1, 1913, whichever is greater.

The petitioner contends that it has sustained a deductible loss under the above sections because it abandoned, during 1927, its territorial rights in Japan. The respondent's holding that the petitioner did not sustain a deductible loss in 1927 upon its investment in its Japanese territorial rights is prima facie correct, and the burden in this proceeding is upon the petitioner to overcome the presumption in favor of the respondent's determination. We are not satisfied that the petitioner has met its burden. The respondent disallowed the deduction partly upon the theory that the operations in Japan had always shown a loss, that the Japanese rights had no value at any time, and that there was no showing that conditions changed in 1927 which made the rights worthless in that year. There is no adequate showing that this holding of the respondent is not correct.

In the first place there is some doubt as to whether the rights in question were worthless in the year 1927. T. J. Foster, who was president of the International Correspondence School until 1916, testified that there was nothing done to develop the business in Japan between 1911 and 1916, the period of his connection with the company. There was practically nothing done in this respect previous to 1924. Previous to that year petitioner was absorbed in developing its business elsewhere. He also testified that, generally speaking, petitioner's business was susceptible of successful and profitable development everywhere in the world. Furthermore, it is to be noted that in 1927 petitioner's Japanese manager, after a survey of the territory, recommended that petitioner invest additional capital in Japan, that it engage in an advertising campaign, and that it intensify its activities to secure additional students. This indicates that in the manager's opinion the rights were still valuable in 1927. However, assuming for the purpose of argument, but not deciding, that the rights were worthless in 1927, there is no showing that such rights became worthless in the year 1927. We can not determine from the evidence that any identifiable event transpired in 1927 giving rise to a loss upon these rights. Losses

are allowable as deductions only when fixed by identifiable events. See *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398, and *Charles O. Middleton*, 25 B.T.A. 484, 487.

The petitioner acquired the territorial rights to Japan on March 14, 1911, for stock. Up to 1923 no attention was paid by the petitioner to the development of its business in Japan. Its agent for Japan was stationed at Shanghai, China. The evidence shows that, beginning in 1923, more attention was given to the development of business in Japan. In 1927 the petitioner was securing only one or two enrollments per month in Japan, but there is no evidence upon which we can determine that the situation with regard to the enrollment of students in Japan became worse in 1927 than it was in prior years. The evidence which we do have before us tends to indicate that there was very little change, if any, in the number of enrollments. The evidence shows that there were 27 new enrollments in Japan in the fiscal year ended April 30, 1919, and the evidence shows that thereafter, after the Japanese earthquake, and particularly after the resentment caused in Japan by the Exclusion Act of July 1924, the number of enrollments dropped very considerably.

It is true that in 1927 Sabiston, for the first time, learned that the Kobe Technical College was using the International Correspondence School's textbooks in teaching its class on electrical engineering and that the petitioner probably could obtain no redress in the Japanese courts. This, it is claimed by the petitioner, influenced it to abandon the rights and forms the basis for the deduction of a loss in this regard. It is to be noted in this connection that when Sabiston made his trip to Japan in 1927 he was fortified with authority to abandon the territory if he saw fit. This indicates that even before learning of the use of the textbooks by the Kobe Technical College there was some idea of the possibility of abandoning the rights in that territory. However, even if the use of its textbooks by the college were considered such an event as might establish a loss to the petitioner, there is no showing as to when that college commenced to use the books. Losses are deductible in the year in which actually sustained and not in the year in which the loss is ascertained by the taxpayer. *Charles O. Middleton, supra.* The very fact that the petitioner could not obtain redress for any violation of its rights in Japan tends to indicate that the holding of the respondent that such rights had the same value all the while is correct. If one college could use the books with immunity, any number of others might. T. J. Foster testified that the company never made inquiries as to whether the Japanese law gave the company protection similar to that afforded by the copyright laws of the

United States, but that if the company had translated its books into the Japanese language it could have probably gotten copyrights. This indicates that during the whole time that the petitioner was operating in Japan it was subject to the hazard that other organizations might have pursued the same policy as the Kobe Technical College, and tends to sustain the respondent's holding that nothing transpired in this regard to render the rights worthless in 1927.

To permit the petitioner to deduct a loss in 1927 simply because it decided to charge the rights off its books in that year and actually charged them off in that year would be to allow the petitioner the right to choose the year in which to take the deduction. This, we believe, was not the intention of Congress in enacting the statute. The decision to charge off and the actual charge-off must bear some reasonable relation to the time when the property became worthless. In *Celluloid Co.*, 9 B.T.A. 989, 1004, we stated: A discontinuance of the use of machinery alone does not prove a loss in respect of the machinery. In *Baltimore County Jeffersonian Printing & Publishing Co.*, 8 B.T.A. 941, we stated:

The action of the respondent in disallowing the cost of the "New Era" as a loss sustained and charged off in the taxable year is approved. Upon the evidence, assuming that the purchase in question resulted in the loss claimed, it is clear that such loss was not sustained in 1922. The "New Era" was acquired in November of 1921, and its publication as a newspaper was discontinued after only one or two issues. It is also in evidence that the petitioner still retains the ownership and right to publish the "New Era." In fact it now owns everything that it purchased from the New Era Publishing Co. and *the fact that it discontinued the issue of the "New Era" is not in itself sufficient to convince us that the property acquired became worthless in the taxable year.* [Emphasis supplied.]

It is to be noted in the instant proceeding that there is no showing that the petitioner actually canceled or surrendered its contract with the Textbook Co., which granted it the territorial rights in question, or that it in any way relinquished such contractual rights as between it and the Textbook Co. Apparently the petitioner still has all of the rights which it obtained from the Textbook Co. and simply ceased to exercise such rights. Under the above authorities this is not sufficient to show that the rights became worthless in 1927. It is true, of course, that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility for eventual recoupment, *Wheeling Tile Co.* v. *Commissioner*, 25 Fed. (2d) 455, but from the record here we are not satisfied that there was an intention to abandon coupled with an abandonment of the rights in question in the year 1927. The evidence here does not satisfy us that the petitioner was reasonably justified in concluding, if it did conclude, that the rights became worthless in 1927.

In the view we have taken it is unnecessary to consider the question of the basis to be used in computing the loss on the rights in question.

The respondent's determination is approved.

Reviewed by the Board.

*Decision will be entered for the respondent.*

TRAMMELL dissents.